700 P.2d 1

**FISH BREEDERS OF IDAHO, INC.,**
an Idaho corporation,
Plaintiff-Appellant,

v.

**RANGEN, INC., An Idaho corporation,**
Defendant-Respondent.

No. 14805.

Supreme Court of Idaho.

March 19, 1985.

Lloyd J. Webb, of Webb, Burton, Carlson, Pedersen & Paine, Twin Falls, Idaho, for Fish Breeders.

G. Kent Taylor, of Taylor, Beito, Sinclair & Covington, Twin Falls, Idaho; and Stanford B. Owen, of Fabian & Clendenin, Salt Lake City, Utah, for defendant-respondent.

DONALDSON, Chief Justice.

Appellant, Fish Breeders, is the only catfish raising facility in Idaho. Respondent, Rangen, is primarily in the feed and grain business. Though Rangen does not specialize in chemicals for treating fish, it does stock small quantities of these chemicals. The present action concerns Rangen's sale of a fish chemical called malachite green to Fish Breeders.

Malachite green is a chemical dye used primarily as a coloring agent in the textile industry. It has been found effective in treating fungi and parasites that often plague commercially raised fish. Malachite green enjoys extensive use in the treatment of fish diseases, but it may be toxic to fish if too much is used. It is customarily sold to fish farmers unpackaged and without instructions or warnings because every farmer's operation is different and requires different methods and levels of application. Therefore, farmers will generally pre-test a chemical before using it. Rangen's malachite green would arrive from the chemical distributor in a large barrel without warnings or instructions, and would be dispensed into buckets or containers supplied by the farmer who was purchasing the chemical.

For several years prior to using Rangen's malachite green, Fish Breeders treated its catfish with a product known as Ox Color Works. Ox Color Works is pure malachite green diluted to 50% strength with salt. Fish Breeders had obtained this product from a supplier not a party to this action. Rangen also sold Ox Color Works at the time and had sold some to other fish hatcheries in the area. However, Rangen never sold Ox Color Works to Fish Breeders or to anyone connected with Fish Breeders.

In January, 1979, Fish Breeders asked Rangen for "25 pounds of malachite green." There was no evidence introduced at trial to suggest that any of Rangen's prior sales of Ox Color Works induced Fish Breeders' decision to buy from Rangen. Without knowing of Fish Breeders' past experience with Ox Color Works, Rangen sold Fish Breeders 25 pounds of 100% pure malachite green it had recently obtained. Fish Breeders applied the 100% malachite green at the same level of treatment as the Ox Color Works. The next morning approximately 40,000 catfish were found dead in Fish Breeders' ponds. Fish Breeders brought this action for damages against Rangen on September 6, 1979.

The case was tried from April 19, 1982 through April 27, 1982. On April 27, the jury returned a verdict for Rangen on all counts. In response to the special interrogatories submitted, the jury found: that while Rangen breached a warranty, the breach did not cause Fish Breeders' losses; that the malachite green was not unreasonably dangerous; that Fish Breeders had misused and assumed the risk of the use of malachite green; that Rangen was 35% negligent and Fish Breeders was 65% contributorily negligent. Damages were assessed at zero.

On May 6, 1982, Fish Breeders moved for a new trial challenging the verdict as inconsistent, inadequate and improper. In addition, Fish Breeders insisted that the trial court erred by excluding as evidence

"proof of losses by other individuals who purchased from the same lot of chemical as did the Plaintiff." After hearing oral argument on the motion, the Court denied Fish Breeders' request.

Four issues are presented by this appeal:

1. Whether the trial court improperly excluded Fish Breeders' evidence of trout kills suffered by other hatcheries?

2. Whether the jury instructions on warranty, negligence and strict liability were adequate?

3. Whether the jury verdict was adequate under I.R.C.P. 48(b)?

4. Whether the jury responses to the special interrogatories were inconsistent?

Each issue will be discussed in turn.

## I.

■ Appellant contends that the trial court erred in excluding Fish Breeders' evidence of trout kills suffered by other fish hatcheries in the area. Decisions regarding the inclusion or exclusion of evidence are within the sound discretion of the trial court and will not be upset on appeal absent a showing that the trial court abused its discretion. See, e.g., Rosenberg v. Toetly, 94 Idaho 413, 489 P.2d 446 (1971). Evidence of other accidents may be admissible to prove the existence of a particular physical condition or defect, the risk created by a defendant's conduct, that the defect cause the alleged injury, or that a defendant had notice of the danger. McCormick on Evidence, § 200 (3rd Ed. 1984). Evidence of other accidents may be excluded if the trial court decides that the evidence would unfairly prejudice the opposing party, that the other accidents are not substantially similar to the subject case, or that admission will raise collateral issues or confuse the jurors. Id.

Appellant claims that the proffered evidence would show that the other hatcheries had been applying the weaker strength malachite green, that they did not pretest the respondent's chemical before applying it and that they experienced fish kills also. Fish Breeders theorizes that 1) Fish Breed-

ers' use of Rangen's malachite green without pre-testing was standard practice and thus Rangen knew or should have known of the risk created by Rangen's conduct; 2) Rangen's malachite green did in fact cause Fish Breeders' fish kill. Therefore, Fish Breeders concludes that the evidence is relevant and admissible.

■ The record reflects that the trial court expressed doubt about the similarity of the other kills to the subject kill and was concerned that the proffered evidence would raise too many collateral issues and confuse the jurors. The trial court heard argument on the issue several times throughout the trial. The trial court did permit Fish Breeders to question the other fish hatchery operators about their pretesting practices and procedures generally in order for Fish Breeders to establish a standard practice. Fish Breeders was also permitted to question the other fish hatchery operators about their prior use of malachite green and their use of Rangen's malachite green. Further, Fish Breeders introduced testimony of its own employees and experts concerning the events surrounding the fish kill in order to establish causation. The only evidence Fish Breeders was not permitted to enter was evidence of the other hatcheries' actual losses. Thus, the record reflects that the trial court carefully considered the admissibility of Fish Breeders' evidence and excluded only the most prejudicial and collateral evidence. Therefore, the trial court did not abuse its discretion in excluding Fish Breeders' evidence of other fish kills. Fish Breeders' request for a new trial on this issue is denied.

■ Appellant contends that the trial court considered the evidence of other kills for its value in showing notice but was unaware that it could be used to prove causation or the risk created by Rangen's conduct. We disagree. The record reflects that both parties argued about the use of the evidence for purposes other than

notice and that the trial court considered it for other purposes.[1]

■ Appellant also argues that Rangen "opened the door" for Fish Breeders to introduce evidence of the other kills. Appellant points out that Rangen's opening statement included the assertion that Rangen was unaware of any other fish kills. Appellant contends that these remarks unfairly prejudiced Fish Breeders and that Fish Breeders should be allowed to rebut Rangen's statement by introducing evidence of other kills. We are unpersuaded by this argument for two reasons: First, Rangen's remark during its opening statement was that until Fish Breeders' fish kill, Rangen had not one complaint about its malachite green. This statement is true. Rangen did not mention its knowledge of subsequent fish kills. Second, Fish Breeders itself mentioned the other fish kills in its opening statement. It was not until after Fish Breeders' opening statement that the introduction of evidence of other kills was limited. Therefore, Fish Breeders was not prejudiced by Rangen's statement.

## II.

Appellant next challenges the adequacy of the jury instructions. With respect to its warranty claim, Fish Breeders argues that the trial court erred in refusing its requested Instructions 9, 10, 19, 31 and 32. With respect to the strict liability claim, Fish Breeders argues that the trial court erred in refusing its requested Instructions 20, 23–28, 31 and 32.

On review, jury instructions must be examined as a whole to determine whether the jury was properly and adequately instructed. The refusal to give a particular instruction is not erroneous where the substance of the proposed instruction is covered elsewhere. *McBride v. Ford Motor Co.*, 105 Idaho 753, 760, 673 P.2d 55, 62 (1983). Also, if the requested instruction misstates

the pertinent law, the refusal to give that instruction is not erroneous. *Id.* As long as the instructions fairly and adequately present the issues and state the applicable law, no error is committed. *Id.* In this case, the jury instructions fairly and adequately describe Fish Breeders' warranty and strict liability claims and state the law applicable to such claims.

■ Appellant specifically challenges the adequacy of the trial court's warranty instructions. Fish Breeders argues that the trial court's refusal to give Fish Breeders' Instructions 9 and 10 dealing with the creation of express warranties was erroneous. However, as the trial court correctly noted, Fish Breeders' Instructions 9 and 10 were fully covered by the court's Instruction 6. Requested Instructions 9 and 10 did nothing more than restate Fish Breeders' Instruction 8 which was identical to the court's Instruction 6.

Appellant also challenges the court's refusal of requested Instruction 19 which states that an express warranty does not negate an implied warranty. However, the trial court gave no less than ten instructions on Fish Breeders' warranty claim which, as a whole, fairly and adequately presented the law. Fish Breeders' Instruction 19 adds nothing significant to the court's warranty instructions and therefore, the trial court's refusal was harmless.

■ Finally, Fish Breeders insists that the trial court's refusal of Fish Breeders' Instructions 31 and 32 was erroneous. Fish Breeders' Instructions 31 and 32 deal with what the jury may consider in determining the cause of Fish Breeders' injuries. Again, as the trial court noted, the substance of Fish Breeders' Instruction 31 was covered elsewhere—in the court's Instructions 1, 2, 3 and 4. Fish Breeders' Instruction 32, also dealing with causation, mainly

---

1. "THE COURT: Well, there is no doubt about it. Unless these were prior to the 16th of January, 1979, and unless Rangen was put on notice of these other events, then they are inadmissible.
   "Now, I know that your next point is, well, Rangen had the obligation to determine what

he was selling and warn people of its potentialities; and I have to agree there. And if you can establish from whatever evidence you got that he did know and did not warn them, fine. But let's don't go into these other kills trying to bring in something from the outside as proof."

restates Fish Breeders' Instruction 31 but does so in such a misleading and confusing way that the trial court properly refused it. Therefore, Fish Breeders' Instructions 9, 10, 19, 31, and 32 were properly refused.

■ Appellant also challenges the court's strict liability instructions. Fish Breeders first argues that the court erred in refusing its Instructions 20–27. These instructions deal with a distributor's duty to test for and warn of dangers in a product which are not obvious. They also state the proposition that the lack of warnings may render a product defective. Fish Breeders' argument fails for three reasons. First, as the trial court noted, the substance of most of these instructions was covered elsewhere. Furthermore, Fish Breeders' opening and closing arguments included statements concerning the duty to warn and that a lack of warnings may render a product defective. Fish Breeders' case in chief was directed to showing that Rangen had a duty to warn of the toxicity of the malachite green. The court's Instructions 18 and 19, which are nearly identical to Idaho Pattern Jury Instructions 1002 and 1003, correctly stated the law relating to a distributor's duty to warn. Second, Fish Breeders' instructions which were not already covered misstated the law. Fish Breeders' instructions impose an absolute duty upon a distributor to test for, discover and warn of all possible dangers associated with a product. As the court's Instructions 18 and 19 point out, that is not the law. Third, Fish Breeders' Instructions 20–27 are unduly long, confusing and repetitive, and the court's refusal to give them was not prejudicial.

■ Fish Breeders also challenges the trial court's refusal of its general strict liability instruction, Instruction 28. Fish Breeders argues that the jury was not adequately instructed on the general theory of strict liability. However, Fish Breeders' strict liability theory was adequately covered by the court's other instructions. First, at the beginning of trial, the court instructed the jury that one of Fish Breeders' theories was strict liability. Then, in open-

ing argument, Fish Breeders explained that Rangen was strictly liable for Fish Breeders' losses because Rangen knew of a change in the toxicity of the malachite green and failed to warn Fish Breeders. Fish Breeders also introduced the testimony of other fish hatchery operators in an attempt to show that it was common not to pretest previously used chemicals before using them and to show that Rangen was aware of the practice. In both parties' closing arguments, strict liability was explained. Fish Breeders explained that failure to warn renders a product defective. Fish Breeders also explained that if the defective condition created an unreasonably dangerous situation which Fish Breeders asserted it did, the party responsible for the condition is strictly liable. Rangen also discussed the terms "defective" and "unreasonably dangerous" in Rangen's closing argument. Following trial, the jury deliberated with the court's Instructions, and particularly with Instructions 4, 18, 19, 23, and 24 regarding strict liability and the special verdict form. The special verdict form included the following segment:

"2. As to the Plaintiff's claim of strict liability in tort:

"QUESTION NO. 1: Did the defendants, Rangen, Inc., sell a product to the plaintiff in a defective condition, as that term is described in these instructions, unreasonably dangerous to the plaintiff for a use of that product for a purpose known to the defendant, Rangen, Inc.?

Answer: Yes ____  No  12

"QUESTION NO. 2: Did the defendant's sale of the product in the condition in which it was sold directly and proximately result in damages to the plaintiff?

Answer: Yes ____  No  12

"QUESTION NO. 3: Did the plaintiff misuse the product sold by the defendant, or did it voluntarily and unreasonably proceed with the use of the product in the face of a known danger?

Answer: Yes  11   No  1

"QUESTION NO. 4: Did any such action on the part of the plaintiff result directly and proximately in damage to it?

Answer: Yes  10   No  2  "

Thus, the jury was well informed as to Fish Breeders' strict liability claim. Therefore, the trial court's refusal of Fish Breeders' general strict liability Instruction 28 was not prejudicial and does not require a new trial.

Finally, Fish Breeders challenges the trial court's refusal of Fish Breeders' Instructions 31 and 32 with respect to Fish Breeders' strict liability claim. As we stated above in our discussion of Fish Breeders' warranty instruction challenges, these instructions were either covered elsewhere, or they misstated the law and were properly refused.

Accordingly, we conclude that the jury was adequately instructed on the general principles of law relating to Fish Breeders' strict liability and warranty claims. Fish Breeders' request for a new trial on these grounds is, therefore, denied.

### III.

Fish Breeders next challenges the adequacy of the jury verdict. Appellant interprets I.R.C.P. 48(b), to require that where the juror's answers to special interrogatories are not unanimous, all agreeing jurors must sign each of the less than unanimous responses. Fish Breeders points out that all of the jurors signed the verdict only once, at the end of the verdict. This was done even though their responses to the interrogatories were not unanimous. Fish Breeders therefore concludes that the verdict is inadequate and that a new trial is required.

I.R.C.P. 48(b) provides in pertinent part: "The verdict must be in writing and signed by the foreman if all the jurors agree, but if not all jurors agree, the written verdict must be signed by all agreeing jurors."

Assuming, but not deciding, that each interrogatory should have been signed by the agreeing jurors, we hold that Fish Breeders was not sufficiently prejudiced to grant a new trial. The jury found against Fish Breeders on each of its theories. On Fish Breeders' warranty claim, all but one juror found against Fish Breeders. On Fish Breeders' strict liability claim, all jurors found against Fish Breeders. On Fish Breeders' negligence claim, all jurors found that Fish Breeders was contributorily negligent. To grant a new trial in the presence of such overwhelming direction from the jury would be to exalt form over substance. Cf. Tillman v. Thomas, 99 Idaho 569, 585 P.2d 1280 (1978). Moreover, all of the jurors did sign the verdict in the only place provided—at the end of the special verdict form. There was no room to sign after each question. Fish Breeders had ample opportunity to object to the form of the verdict during trial before the verdict was given to the jury and did not. See Garrett v. Nobles, 102 Idaho 369, 374, 630 P.2d 656, 661 (1981). Also, Fish Breeders had a chance to poll the jury if it wanted to determine exactly how each juror decided. The trial court specifically asked Fish Breeders if it wanted to poll the jury and Fish Breeders abstained. See Quincy v. Joint School Dist. No. 41, Etc., 102 Idaho 764, 769, 640 P.2d 304, 309 (1981).

Accordingly, we hold that the trial court did not abuse its discretion in refusing to grant a new trial on this issue and, therefore, Fish Breeders' request for a new trial is denied.

### IV.

Fish Breeders' final challenge is to the verdict's consistency. Fish Breeders' argument is two-pronged. First, it argues that the jury's finding that Rangen's breach of warranty did not result in damage to Fish Breeders was inconsistent with the finding that Rangen's negligence proximately caused Fish Breeders' loss. Second, it argues that the finding that Rangen's negligence caused Fish Breeders' loss is inconsistent with the finding that Fish Breeders' damages were zero. Therefore, Fish Breeders contends that the trial court erred in refusing to grant a new trial.

This Court has a duty to reconcile the jury answers to special interrogatories, if possible, to avoid invading the province of

the jury. *Tillman v. Thomas, supra*, 99 Idaho at 571, 585 P.2d at 1282 (1978). Further, we agree with the statement by the Fifth Circuit Court of Appeals that "even if a conflict exists, we must inquire whether the inconsistency can nonetheless be read as a consistent expression of intent that [defendant] is either liable or not liable." *Special Promotions, Inc. v. Southwest Photos, Ltd.*, 559 F.2d 430, 432 (5th Cir. 1977).

In this case, the alleged inconsistency in the findings that Rangen's breach of warranty did not damage Fish Breeders and that Rangen's negligence caused Fish Breeders' injuries can be resolved. Negligence and warranty claims involve two separate theories requiring independent analysis. For example, Fish Breeders' warranty claim involved express or implied representations that Rangen allegedly made to the Fish Breeders. Fish Breeders' negligence claim involved Rangen's failure to warn Fish Breeders of dangers involved with the malachite green and Rangen's own failure to test the malachite green. These theories include various acts or omissions, the relevancy of which depends on the particular theory being considered.

Likewise, Fish Breeders' challenge to the jury finding of zero damages may be reconciled with the other responses. Since the question assessing damages was the very last question on the special verdict form and unrelated numerically to any of the specific theories, the jury probably thought the question was intended as a measure of Fish Breeders' recovery. Having found against Fish Breeders on all theories, the jury most likely assumed that Fish Breeders was entitled to nothing.

Moreover, with respect to both inconsistencies, the jury's intent is readily apparent throughout its answers. The jury expressly found that Fish Breeders could not recover under its warranty claim because Rangen's breach was not a proximate cause of Fish Breeders' damage. The jury also found that Fish Breeders was not entitled to recover under its strict liability claim because Rangen did not sell a defective product which was unreasonably dangerous. The jury found that Fish Breeders misused the product or that it proceeded unreasonably in the face of a known danger. Finally, the jury found that Fish Breeders was not entitled to recover under its negligence claim because its negligence was greater than Rangen's.

Accordingly, the trial court did not err in refusing to grant Fish Breeders a new trial on this count.

The judgment of the trial court is affirmed.

Costs to respondent.

No attorney fees on appeal.

BAKES, J., concurs.

SHEPARD, J., concurs in the result.

BISTLINE, Justice, dissenting, with whom HUNTLEY, Justice, concurs.

After briefly addressing specific problems appearing in the majority opinion, I will submit that which to my mind is an opinion more consonant with the facts and the law.

## I.

The majority opinion affirms the district court's exclusion of Fish Breeders' evidence of other fish kills in the same area by fish producers using defendant's product. The reasons put forth by the majority are that such evidence was irrelevant, and would prejudice the defendants and hence confuse the jurors.

Fish Breeders in all likelihood offered the evidence because it *was* prejudicial—it tended to prove that defendant Rangen, Inc. had breached strict liability requirements. Because the evidence was prejudicial, however, does not render it inadmissible—provided that it was relevant and, of course, competent. Lawsuits are won, and lost, on prejudicial evidence relevant to the issues being tried. Evidence which is probative can hardly escape being relative. Here, the evidence in question was extremely probative with respect to the issue

being tried—was the product Rangen, Inc. produced and delivered to Fish Breeders defective; did Fish Breeders improperly used the product.

The majority's opinion of the capabilities of jurors may be disconcerting, at least to those practitioners who prefer our constitutional jury system. Evidence of other fish kills would not be confusing, and is exactly the kind of evidence which juries desire to have in order to be all the more enlightened.

The extreme high degree of relevance will fully appear on a reading of my views on a proper disposition of this appeal. Fish Breeders' evidence on this point goes a long way toward establishing that the product was defective and that Fish Breeders did not misuse the product.

## II.

The majority's practically naked conclusion that the district court's instructions were adequate is insufficiently substantiated. Nowhere in the instructions is the term "strict liability in tort" defined. Also undefined are the terms "unreasonably dangerous" or "defective condition." These terms were crucial to a lay juror's ability to understand, and hence answer questions relating to Fish Breeders' claim of strict liability. A jury asked to decide whether Rangen was strictly liable to Fish Breeders could not competently do so without being fully instructed in an area of the law so complex that even legal minds struggle.

True, as the majority points out, the district court told the jury that one of Fish Breeders' theories of recovery was strict liability; that in opening argument Fish Breeders' counsel cursorily explained how Rangen would be strictly liable for Fish Breeders' losses; that in closing arguments both sides discussed strict liability; and that the submitted special verdict form asked if Rangen sold a product in a defective condition that was unreasonably dangerous to Fish Breeders. But the fact remains that the jury was *not instructed by the court itself* as to what constitutes a

"defective condition," as to what constitutes "unreasonably dangerous," and as to what is meant by the term "strict liability in tort." Accordingly, Fish Breeders' case did not go to a jury properly instructed.

I believe that which follows should be the Court's disposition today.

Fish Breeders of Idaho, Inc. is the only catfish raising facility in Idaho. Rangen, Inc., although it is primarily in the feed and grain business, stocks small quantities of fish chemicals. The present controversy arose out of Rangen's sale of such a fish chemical to Fish Breeders.

The subject of the disputed transaction was malachite green. Malachite green is a chemical dye used primarily as a coloring agent in the textile industry which has been found effective in treating fungi and parasites that often plague commercially raised fish. Though malachite green enjoys extensive use in the treatment of fish diseases, it may nonetheless be toxic to fish if too much is used. In the present case, the cause of the catfish kill was an overdose of malachite green.

The cause of the overdose is somewhat complicated. Apparently, the principal owner of Fish Breeders, Leo Ray, had for some time purchased a half-strength malachite green product (known as "Ox Color Works") from a chemical distributor who is not a party to this action. Ray mistakenly thought that the product he had been buying was pure malachite green.

In addition, Rangen, too, had previously purchased some of its malachite green, known in the 50 percent diluted state as Ox Color Works, from the same seller and had itself resold that chemical to other fish farmers in the area. However, Rangen had never previously sold the Ox Color Works malachite green to Fish Breeders or to anyone connected with Fish Breeders.

Then, in January, 1979, after it had been unknowingly using the malachite green in the diluted state for several years, Fish Breeders asked Rangen for "25 pounds of malachite green." Without knowing of Fish Breeders' past experience with Ox

Color Works, (the product Fish Breeders had mistakenly thought to contain pure malachite green), Rangen sold Fish Breeders 25 pounds of the 100 percent pure malachite green it had recently obtained from a different manufacturer, Reisman. As a result of its use of the chemical in combination with many other factors present in the Fish Breeders facility at the time, many of Fish Breeders' catfish were killed. Subsequently, Fish Breeders brought this action seeking damages allegedly sustained as a result of the use of the chemical malachite green.

After a lengthy trial, the jury returned verdict for defendant on all counts. Answering the special interrogatories, the jury found that while Rangen breached a warranty, the breach did not cause any damage. Under strict liability, the jury found that the malachite green was not unreasonably dangerous and that Fish Breeders had misused and assumed the risk of the malachite green. Finally, the jury found that while Rangen was 35 percent negligent, Fish Breeders was 65 percent contributorily negligent. Damages were assessed at zero.

Fish Breeders moved for a new trial, alleging that the verdict was inconsistent, inadequate and improper. In addition, it alleged that the trial court erred by refusing to accept in evidence "proof of losses by other individuals who purchased form the same lot of chemical as did the Plaintiff." After hearing oral argument, the Court denied the plaintiff's motion.

## I.

Fish Breeders initially contends that the trial court erred in granting Rangen's motion in limine excluding evidence of other fish kills. After hearing oral argument on the motion, the trial court stated the following:

"THE COURT: Well, there is no doubt about it. Unless these were prior to the 16th of January, 1979 [when Fish Breeders' loss occurred], and unless Rangen was put on notice of these other events, then they are inadmissible."

Fish Breeders argues that, in concentrating solely on the relevance of this evidence with regard to Rangen's duty to warn, the trial court neglected to consider other issues as to which the evidence in question was crucial and, in so doing, abused its discretion.

The evidence in question consisted primarily of testimony by two other fish farmers concerning both their usual practices in connection with the application of malachite green and the separate and independent losses which they likewise sustained after using this particular batch of the chemical. More specifically, Fish Breeders sought to introduce evidence tending to establish that two local trout farmers had (a) following the accepted practice of applying the malachite green without first pretesting it; (b) applied the new (Reisman) malachite green—purchased from Rangen and identical to that used by Fish Breeders—in the same amounts as they had previously applied the old (Ox Color Works) malachite green; (c) which application had resulted in separate and substantial losses of the trout raised in the respective facilities. Although the trial court's rulings allowed some of this information to reach the jury, all evidence pertaining to the other fish kills was absolutely precluded.

We begin by noting that "many jurisdictions have followed the rule that, generally, properly grounded evidence of other accidents involving a product is admissible, in an action for injury or damage due to defects in the article, to prove the dangerous or hazardous nature of the product." Annot., 42 A.L.R.3d 780, 784 (1972) ("Products liability: admissibility of evidence of other accidents to prove hazardous nature of product"). In the present case, Fish Breeders sought recovery on four separate theories. One of these theories of recovery was that of strict liability in tort. In order for them, as plaintiffs, to prevail on this theory, they had the onus of proving that Rangen, as seller, had sold them a product "in a defective condition unreasonably dangerous." As discussed, *infra*, the terms "defective condition" and "unreasonably

dangerous" are not terms of everyday use and understanding. Not only do they require more specific instruction than many such legal terms cast indiscriminately to the collective lay mind of the jury, but the circumstantial nature of their proof, *see, e.g., Farmer v. International Harvester,* 97 Idaho 742, 553 P.2d 1306 (1976), requires a somewhat more relaxed approach to allowing evidence in their attempted demonstration. Therefore, although such proof of subsequent or contemporaneous accidents may indeed, as the trial court noted, be irrelevant to the question of a seller's duty to warn, *see, infra,* it may be quite relevant and, indeed, crucial to the proof of other elements of the plaintiff's strict liability theory of recovery. As the Nevada Supreme Court noted in its discussion of just this question:

"Since we hold the lower court should have instructed upon the strict tort liability doctrine in this case, we also say evidence of subsequent, similar accidents is relevant to causation and a defective and dangerous condition under that theory.

"In 1 Frumer & Friedman, Products Liability § 12.01(4), the authors say: '[E]vidence of subsequent accidents is not ordinarily pertinent to the issue of notice or knowledge. But such evidence may be considered pertinent in determining whether or not the product was hazardous.'

"Likewise, B. Witkin, California Evidence § 353 (2nd ed. 1966), states: 'The relevancy of other accidents, whether prior or subsequent, depends on the purpose for which the evidence is offered. A subsequent accident would not be relevant on the issue of *knowledge or notice* of a possibly dangerous condition at the time of the injury giving rise to the action. But a subsequent accident at the same or a similar place, under the same or similar conditions, is just as relevant as a prior accident to show that the condition was in fact *dangerous or defective,* or that the injury was *caused* by the condition.' (Emphasis in the original.)"

*Ginnis v. Mapes Hotel Corp.,* 86 Nev. 408, 470 P.2d 135, 139 (1970).

In addition to the issues of whether the condition in question, i.e., the difference in the toxicity of the chemical sold without notice provided to buyers thereof, was defective, unreasonably dangerous, or causally related to the damages claimed, the evidence of other similar accidents is highly probative on the question of whether the chemical was misused by Fish Breeders. Although the jury found that Fish Breeders did in fact misuse the product, it cannot be said that such a conclusion would be unaffected by evidence tending to show that others in the same industry, relying on the same general practices and under the same misapprehensions of the product being used, applied the same chemical and suffered the same losses. Fish Breeders should have been allowed to present evidence of similar occurrences in order to effectively present its strict liability theory of recovery and to rebut allegations that it misused the malachite green sold it.

However, Rangen contends that, even assuming the admissibility of the proffered evidence as a general rule in this case the evidence was properly refused because it did not meet the general standards.

Rangen's argument in this regard may essentially be stated as follows: The case law holds that evidence of other accidents is properly excluded where similar circumstances are not shown. In this case, Fish Breeders raised catfish in warm water in intensive culture whereas the disputed evidence was to the effect that the other kills involved trout in cold water under normal (non-intensive) conditions. Therefore, so the argument goes, because the circumstances were so different, it is said that the trial court correctly excluded all evidence of the other fish kills as essentially irrelevant and lacking in any probative value on the issue of who bears responsibility for Fish Breeders' loss.

Although it is true that the circumstances were not absolutely identical in the respective kills, all that is generally required for evidence of other accidents to be admit-

ted is that they have substantial identity. *P.B. Mutrie Motor Transportation, Inc. v. Interchemical Corp.*, 378 F.2d 447 (1st Cir. 1967). That requirement has been met in the present case. In all three fish kills, the respective fish were treated with the same batch of the same chemical in the same way that they had been treated prior to the fatal application. In addition, none of the three growers pre-tested the chemical, relying instead on their own prior experience with what they thought to be the same chemical. Although there appear to be differences, these differences go not to the question of admissibility, but rather to the weight to be accorded such evidence by the finder of fact.[1] *See, e.g., Gall v. Union Ice Co.*, 108 Cal.App.2d 303, 239 P.2d 48 (1951). The evidence in question is precisely the type which a jury would reasonably want to have before it, and which it is peculiarly suited to evaluate.

## II.

Upon remanding for a new trial, this Court must decide all questions of law which have been presented upon appeal and are necessary to a final determination. I.C. § 1-205. *Messmer v. Ker*, 96 Idaho 75, 78, 524 P.2d 536, 539 (1974). Accordingly, it is in order to consider Fish Breeders' further claim that the jury was not adequately instructed as to each of the legal

theories presented by it throughout the trial. It is, of course, axiomatic that "the trial court is under a duty to instruct the jury on every reasonable theory recognized by law that is supported at trial." *Everton v. Blair*, 99 Idaho 14, 16, 576 P.2d 585, 587 (1978). Having carefully reviewed the instructions given the jury in this case, we agree with Fish Breeders.

The primary focus of Fish Breeders' objection is the failure of the trial court to adequately instruct the jury with regard to the law of strict liability. Despite the fact that strict liability was one of the four primary theories of recovery presented by appellant to the jury, it is urged that the trial court nevertheless failed to give even one instruction on strict liability. Rangen, however, points to the following question posed by the trial court in the Special Verdict form:

"As to the Plaintiff's claim of strict liability in tort: ... Did the Defendant, Rangen, Inc., sell a product to the Plaintiff in a defective condition, as that terms is described in these instructions, unreasonably dangerous to the Plaintiff for a use of that product for a purpose known to the Defendant, Rangen, Inc.?"

and contends that the Special Verdict question, when read together with certain of the trial court's other instructions,[2] ade-

---

**1.** It is also noted that the evidence in question meets the other criteria often mentioned in the context of whether evidence of other accidents is admissible. *See generally* Annot. 42 A.L.R.3d 780 (1972). The various fish kills all occurred within a few days of each other, thereby meeting the requirement of reasonable proximity in time between the other accidents and the case at bar. *See, e.g., Davis v. Coca-Cola Bottling Co.*, 228 N.C. 32, 44 S.E.2d 337 (1947). In addition, there can be no legitimate complaint of unfair surprise by Rangen in this case, as it was sufficiently well-apprised of the plaintiff's intentions in this regard to raise the very motion in limine presently under consideration. *See, e.g., Jones & Laughlin Steel Corp. v. Matherne*, 348 F.2d 394 (5th Cir.1965). And finally, it is not readily seen here that the admission in this case of evidence of the other accidents would have created undue confusion in the litigation. The issues were clear, with the excluded evidence clearly bearing on the issues of causation, product misuse, and whether the malachite green

was "unreasonably dangerous" and in a "defective condition." *See, infra.* Jurors could easily have differentiated the evidence it would have heard on the other fish kills from the questions before it concerning Fish Breeders' loss.

**2.** Rangen specifically points in this regard to the following instructions:
"4. That the defendant made a material misrepresentation of material fact concerning the character or quality of the chemical, malachite green, which material misrepresentation of fact was justifiably relied upon by the plaintiff; or
"5. That the defendant was negligent in its sale of the chemical, malachite green, to the plaintiff, and that negligence was the proximate cause of damage to the plaintiff; or
"6. That the defendant sold the chemical, malachite green, when that chemical was unsafe for the use which the defendant knew that the plaintiff intended to give the chemical

quately covers what respondent calls "the basic question under strict liability—did the defendant sell an unreasonably dangerous product?" Respondent's Brief, p. 39.

This is not at all persuasive. In addition to providing no instruction as to what is meant by the term "strict liability in tort," *compare with, e.g., Rindlisbaker v. Wilson*, 95 Idaho 752, 758, 519 P.2d 421 (1974), and *McBride v. Ford Motor Co.*, 105 Idaho 753, 766, 673 P.2d 55 (1983), a term which is neither common nor intuitively obvious or self-explanatory to a layman, the trial court gave no instruction at all on two terms—"unreasonably dangerous" and "defective condition"—which are crucial to a juror's ability to answer the questions posed.

Despite the suggested implication in the Special Verdict form that the term "defective condition" had been described somewhere else in the jury instructions, it is clear that this was not in fact the case. However, considerably more important is the fact that, as a term of art, accompanied by a whole range of specific legal meanings, "defective condition" requires at least some definition and clarification by the trial court in its instructions. In *Rindlisbaker*

*v. Wilson, supra,* we approved the following jury instruction:

"No. 51

"A product may be defective, within the meaning of that term as used in the rule of strict liability, not only when it contains unsafe or defective materials or parts, but also if any part of its fundamental design exposes users or bystanders to an unreasonable risk of physical injury.

"A product may also be defective, even though it might be faultlessly made, if it is unreasonably dangerous to place it in the hands of a user without giving suitable and adequate warnings or instructions concerning the safe manner in which to use it." [3]

It is not the purpose by the foregoing discussion to dictate the nature of the instructions to be given on remand or in other strict liability cases in this state. However, it is wished to emphasize that the question of whether a product is in a defective condition is a complex one which requires clear and careful instruction to the jury. Such an instruction was lacking in this case.

and that the plaintiff was in fact harmed by the unsafe character of the chemical; and

"7. The chemical, malachite green, was not reasonably fit for application upon the plaintiff's fish in the customary manner of that application; and

"8. The chemical, malachite green, resulted proximately in damage to the plaintiff's fish; ...."
Tr., Vol. 6, pp. 1117–18.

**3.** In addition, Comment (g) of the Restatement of Torts, Second, § 402A, devotes itself entirely to the notion of when a product is in a defective condition, noting the following:

"g. *Defective condition.* The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him....

"Safe condition at the time of delivery by the seller will, however, include proper packaging....

"h. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling ..., or from abnormal preparation for use ..., or from abnormal consump-

tion ..., the seller is not liable. Where however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment j), and a product sold without such warning is in a defective condition....

"j. *Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.... Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required."

Similarly, it is clear that the question of whether the product in question is "unreasonably dangerous," what Rangen calls "the basic question under strict liability," *supra,* 95 Idaho at 758, 519 P.2d 421, also requires careful jury instruction by the trial court. "[W]ithin the context of products liability ..., the concept of 'unreasonably dangerous' is neither generally understood by jurors nor within their common experience." *Becker v. Aquaslide 'N' Dive Corp.,* 35 Ill.App.3d 479, 341 N.E.2d 369, 377 (1976). As with "defective condition," the phrase "unreasonably dangerous" has itself given rise to an entire line of cases, *see, e.g., Cronin v. J.B.E. Olson Corp.,* 8 Cal.3d 121, 104 Cal.Rptr. 433, 501 P.2d 1153 (1972), as well as an entire comment by the very authors of the Restatement who penned it. *See* Restatement (Second) of Torts, § 402A, Comment i. In addition, this Court has specifically addressed this element of the strict liability cause of action in *Farmer v. International Harvester Co.,* 97 Idaho 742, 749, 553 P.2d 1306 (1976), and offered guidance as to how the requirement that a product be "unreasonably dangerous" should be properly understood and applied:

> "One further aspect of a plaintiff's case is the requirement that he must prove that the defect in the product rendered it 'unreasonably dangerous.' Restatement (Second) of Torts § 402A, Comment i (1965). Ordinarily, the evidence indicating the presence of the defect in the product or permitting its inference under all the circumstances will also prove or permit the inference to be drawn that the defective condition of the product made it unreasonably dangerous."

Given the nature of the issues involved, it is evident that the trial court failed in its duty to adequately instruct the jury on this theory of recovery.[4]

---

4. Although agreeing with Fish Breeders' contention that the trial court failed to adequately instruct the jury on its theory of strict liability in tort, it is noted that those instructions requested by Fish Breeders were either themselves incorrect or did not vary substantially enough from the instructions given by the trial court to justify a reversal on that basis alone.