731 P.2d 1267

David **SLIMAN** and Carolyn Sliman,
husband and wife,
**Plaintiffs/Respondents/Cross-Appellants,**

v.

**ALUMINUM COMPANY OF AMERICA,**
a Pennsylvania corporation,
**Defendant/Appellant/Cross-Respondent,**

and

Seven-Up U.S.A., a Missouri corporation;
Noel Canning Corporation, a foreign
corporation; 7–Up Bottling Company
of Twin Falls, Idaho, an Idaho corpora-
tion; Safeway Stores Incorporated, a
Maryland corporation, Defendants.

No. 15883.

Supreme Court of Idaho.

Nov. 24, 1986.

Rehearing Denied Dec. 31, 1986.

Louis F. Racine, Jr. (argued), of Racine, Olson, Nye, Cooper & Budge, Pocatello, and Larry D. Ottaway (argued), G. David Ross, of Foliart, Huff, Ottaway & Caldwell, Oklahoma City, Okl., for defendant/appellant/cross-respondent.

Wilbur T. Nelson (argued), of Nelson, Westberg & McCabe, Chartered, and Joseph M. Imhoff, Jr., of Imhoff & Lynch, Boise, for plaintiffs/respondents/cross-appellants.

BISTLINE, Justice.

Plaintiff Carolyn Sliman suffered complete loss of sight in her left eye as a result of an aluminum twist-off cap having forcibly ejected from a 7–Up soft drink bottle. Plaintiffs sued the defendant-appellant Aluminum Company of America (ALCOA), Seven-Up U.S.A. Inc., Noel Canning (Seven-Up U.S.A.'s bottler), and various other defendants. After trial a jury found plaintiff Carolyn Sliman 25 percent at fault, defendant Seven-Up U.S.A. 45 percent at fault, ALCOA 30 percent at fault, and apportioned no fault to the rest of the defendants. The jury found the plaintiffs' damages to amount to $100,000 and further assessed punitive damages against defendant Seven-Up U.S.A. of $200,000 and against ALCOA $100,000. ALCOA appeals from that judgment. *We affirm.*

## I. BACKGROUND

On October 9, 1979 Carolyn Sliman prepared to open a two-liter plastic bottle of 7–Up. The bottle was capped with an aluminum twist-off closure with an aluminum band around its bottom known as a "pilfer-proof band." Neither the cap nor the bottle bore any warnings concerning the cap blowing off, or any instructions of how to remove the cap. Believing that the pilfer-proof band must be removed before removing the twist-off cap itself, she pulled at the band with a pair of pliers. At this point, the cap exploded from the bottle and struck her in the left eye. The impact caused permanent injury including the complete loss of sight in her eye.

Plaintiffs recount the following facts developed at trial:

1. ALCOA designed and presented to the industry the system for closure of soft drink bottles with aluminum caps.

2. ALCOA designed, patented, and marketed the closure involved in the instant accident, known as a "top side pilfer-proof closure."

3. From the beginning of its design, manufacture, and marketing of the caps,

ALCOA recognized a potential for forceful blow-off.

4. ALCOA increased the manufacture and marketing of these caps and of machines to apply the caps from 1967 to the date of the accident in 1979 despite receiving notification (generally by claims or lawsuits) of 229 injuries to consumers due to blow-offs of these caps. ALCOA was aware that the rate of injuries to consumers increased in proportion to the number of closures sold. ALCOA further was aware that the forceful blow-off of closures could occur for a variety of reasons, including misapplication of its caps by the bottlers, mishandling by consumers, and so-called "tail-end blow-offs" which could occur after usual and customary handling by consumers. ALCOA knew that premature blow-offs could never be entirely eliminated.

5. During the period from 1967–79, ALCOA made only one change in its specifications for threads on the manufactured bottles (called the "bottle finish"). This change did not reduce incidents of blow-offs or injuries to consumers.

6. From 1967 to 1979, ALCOA took no action to warn consumers or to recommend or require that soft drink franchisers or bottlers who purchased its product do so. Nor had ALCOA effectively modified its product or restricted or terminated its marketing.

7. As early as 1973 ALCOA's senior packaging engineer was aware of a proposed bottle finish which might prevent premature blow-off by use of vertical slots to safely vent carbon dioxide gas pressure before the cap was released. Nevertheless, ALCOA made no effort prior to the date of the accident to implement such a change in the bottle finish, even though plastic bottles of the type involved in this case were amenable to the new bottle finish and had been in use for at least two years prior to the accident.

ALCOA presents an additional set of facts:

1. At the time the cap left the possession of ALCOA, it was a cylindrical shell without threads and without defect.

2. The bottler applies the unthreaded shell to the bottle with a capping machine that creates a seal and a fit.

3. When the shell is properly applied, in the manner recommended by Seven-Up U.S.A. and ALCOA, the product can be opened safely.

4. In this case, there was no defect in the shell or other components of the soft drink package until Carolyn Sliman applied pliers to the cap.

5. In its agreement with its bottling companies, Seven-Up U.S.A. has strict and absolute control over all package shapes, components, labels, and graphics.

6. ALCOA never had possession or control of the beverage, bottle, or final soft drink package involved in the instant accident. Nor did ALCOA have any right or opportunity to direct the assembly or manufacturing process.

7. Prior to the instant accident, ALCOA advised Seven-Up U.S.A. and its bottling company that personal injury could result if a closure was improperly applied.

On appeal, ALCOA raises three issues which we now address.

## II.

ALCOA initially contends that the case should not have been submitted to the jury, because ALCOA had no duty to warn Carolyn Sliman. Writing for a unanimous Court, Justice Bakes comprehensively discussed the standard of review appropriate to this issue:

Our task on appeal from a jury verdict is to determine if there was substantial, competent evidence to support the verdict. ... The substantial evidence test also applies to an appeal from a denial of a motion for judgment n.o.v. ... In reviewing the evidence, we must view it in a light most favorable to the respondent. ... Only when the findings of the trier of fact are clearly erroneous will the verdict be set aside. ... A finding of

the trier of fact will be set aside only if there is no substantial evidence to support it.

> *Spanbauer v. J.R. Simplot Co.*, 107 Idaho 42, 44, 685 P.2d 271, 273 (1984) (citations omitted).

In the context of both negligence and strict liability, a supplier in some situations has the duty to warn of risks from its products. In an action based on negligence, this Court has held:

> As a general rule, if any supplier, including the distributor, of a product knows or has reason to know that the product is likely to be unsafe when used for the purpose for which it is supplied, and has no reason to believe that the persons for whose use the product was supplied will realize its unsafe condition, then the supplier has a duty to exercise reasonable care adequately to warn them of the unsafe condition or of the facts which make the product likely to be dangerous.
>
> *Robinson v. Williamsen Idaho Equipment Co.*, 94 Idaho 819, 825, 498 P.2d 1292, 1298 (1973) *(citing Restatement (Second) of Torts* §§ 388, 497) (footnote omitted).

This duty exists only where the manufacturer "knows or has reason to know the unsafe condition of the product when used for the purpose for which it was supplied." *Id.* at 826, 498 P.2d at 1299. The manufacturer is not absolved of its duty to warn if "the product might prove unsafe only to a few, foreseeable users." *Id.* "Even though a product is not inherently defective in design or manufacture, the supplier's duty to warn extends to risks of danger which arise during the known or foreseeable use of the product." *Id.* at 826–27, 498 P.2d at 1299–1300.

In the context of strict liability, "where the defendant has 'reason to anticipate that danger may result from a particular use' of his product and he fails to give adequate warnings of such a danger, 'a product sold without such warning is in a defective condition.'" *Rindlisbaker v. Wilson*, 95 Idaho 752, 759, 519 P.2d 421, 428 (1974) (quoting Restatement (Second) of Torts § 402A comment h). As is apparent, there generally is little difference in the requirements and analysis of the duty to warn under either a negligence or strict liability theory, both of which the plaintiffs advanced. *See Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 386 (1984) and cases cited therein; *see generally*, J. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss.L.J. 825, 842 (1973).[1]

ALCOA contends that it had no duty to warn the ultimate purchaser of its product of the danger of the cap's blow-off. ALCOA bases its contention on two grounds. First, as the manufacturer of a component part in the ultimate product, ALCOA had no effective means to communicate such a warning directly to the ultimate purchaser. ALCOA did issue certain warnings concerning misapplication to the manufacturer, Seven-Up U.S.A., and to the bottler. Accordingly, argues ALCOA, the duty to warn rested exclusively with Seven-Up U.S.A., which controlled the labeling and which chose not to warn of blow-offs. Second, ALCOA had no duty to warn of risks which were not reasonably foreseeable. In ALCOA's view, Carolyn Sliman's manner of removing the cap was not reasonably foreseeable. We will address each of these grounds in turn.

■ The question of when a manufacturer of a component part has the duty to warn of risks associated with it is one of first impression before this Court. However, we take guidance from the recent decision of the Supreme Court of Texas, which addressed a similar question involving the same defendant in *Alm v. Aluminum Company of America*, 717 S.W.2d 588 (Tex.1986). Generally speaking, in some circumstances a supplier positioned on the commercial chain remote from the

---

1. One exception would be where the seller reasonably knew of a danger but failed to communicate a warning at all. In such a case the seller would be strictly liable even though the plaintiff could not establish that the failure resulted from negligence. *See* Restatement (Second) of Torts § 402A comment j (1965), *cited in Rindlisbaker, supra*, 95 Idaho at 759, 519 P.2d at 428.

ultimate consumer may fulfill its duty to warn by adequately warning an intermediary. The *Alm* court noted two such circumstances, the first being "when a drug manufacturer properly warns a prescribing physician of the dangerous propensities of its product.... The doctor stands as a learned intermediary between the manufacturer and the ultimate consumer. Generally, only the doctor could understand the propensities and dangers involved in the use of a given drug." *Id.*, at 591–92. The second circumstance involves "a bulk supplier, one who sells a product to another manufacturer or distributor who in turn packages and sells the product to the public...." *Id.* at 592. Because of its remote position and its lack of control over the labeling and marketing of the ultimate product, a component part manufacturer

also should be able to issue warnings through an intermediary. *Id.*

However, as succinctly observed the *Alm* court, in every circumstance the reliance on the intermediary must be *reasonable.* *Id.; see also Restatement (Second) of Torts* § 388 ("One who supplies directly or through a third person" must "exercise reasonable care to inform [the ultimate user] of [a chattel's] dangerous condition or of the facts which make it likely to be dangerous."), *adopted in Robinson, supra,* 94 Idaho at 825, n. 14, 498 P.2d at 1298 n. 14.[2] Manufacturers, including those of component parts, may not "rely *unquestioningly* on others to sound hue and cry concerning a danger in its product." *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076, 1090 (5th Cir.1973) *cert. denied* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107

2. The dissent concludes that "the majority's reliance on § 388 of the Restatement (Second) of Torts is misplaced." The only basis the dissent provides for this conclusion is caveat (2) to § 402A. What the dissent fails to recognize is that the Slimans' action sounded in negligence as well as strict liability. As explained above, the analysis under strict liability theory is basically the same as under the negligence theory. Section 388 controls in the case of allegations of negligent failure to warn, whether the seller supplies to the purchaser directly or through a third party. This Court adopted § 388 in *Robinson, supra,* a unanimous decision in which Justices Shepard and McFadden joined. *See also* 1A L. Frumer and M. Friedman, *Products Liability* § 8.03[3] (citing § 388 and consistent case law as the "better and more modern view...."). Accordingly, § 388 controls here. The caveat to § 402A obviously has no application to § 388 or to Sliman's negligence claim.

In any event, the dissent further omits the caveat to the caveat, found in § 402A comment p: "It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this section." The only reason the Institute held back was the dearth of case law on the subject in 1965.

Clearly, the better rule, as well-established in post–1965 case law, is to absolve suppliers to intermediaries of their duty to warn only where their reliance on the intermediaries is reasonable. As Restatement comment p (on which the dissent relies) states: "No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not." Where there is evidence as

there is here, that (1) a component part manufacturer knows of a danger, related to its product and (2) knows the intermediary is not issuing a warning of that danger, but fails (1) to suggest to the intermediary that a warning to the consumer is needed, or (2) to attempt to communicate a direct warning, even though in such circumstances warnings through media were customary in the consumer product industry, Tr., p. 108, then the manufacturer should bear the responsibility the jury assigns to it. This "better and more modern view" contrasts with the total, unreasoned, and indiscriminant immunity which the dissent and certain of its authority would grant manufacturers who sell to intermediaries. 1A *Products Liability* § 8.03[3]; *see also* cases cited above at pp. 7–8; and cases cited in *Alm, supra,* at pp. 591–92. It also has constituted the law of Idaho since this Court adopted Restatement § 388 in *Robinson.*

The dissent recites holdings contravening this view of a number of cases without showing their factual circumstances to resemble ours, and without showing any persuasive rationale. The dissent then takes issue with the *Alm* decision, finding the reasoning of dissenting Justice Gonzalez more persuasive. That "reasoning" quoted in the dissent is no more than an unsupported conclusion that a warning to an intermediary ought to insulate a manufacturer from liability. Such a broad-brush approach disregards whether or not the manufacturer was justified in relying on the intermediary, and whether or not the manufacturer could have asked or negotiated for a warning or communicated one directly to the consumer. The Texas Court, behind the well-reasoned and well-documented opinion of Justice Kilgarlin, rejected this approach, as does this Court.

(1974) (emphasis added). As the Restatement notes:

> Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. *The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.*

> Restatement (Second) of Torts § 388, comment n (emphasis added); *see also Borel, supra,* 493 F.2d at 1091 ("The seller's warning must be reasonably calculated to reach [the ultimate consumer] and the presence of an intermediate party will not by itself relieve the seller of this duty.").

As the United States Court of Appeals for the Eighth Circuit observed:

> When a manufacturer can reasonably foresee that the warnings it gives to a purchaser of its product will not be adequately conveyed to probable users of the product, then its duty to warn may extend beyond the purchaser to those persons foreseeably endangered by the product's use. Warnings given to the purchaser do not necessarily insulate the manufacturer from liability to injured users of the product. Restatement (Second) of Torts § 388 & Comment n (1965); L. Frumer & M. Friedman, 1 *Products Liability* § 803[3] (1980).

*Hopkins v. Chip-in-Saw, Inc.,* 630 F.2d 616, 619 (8th Cir.1980); *accord, Seibel v. Symons Corp.,* 221 N.W.2d 50, 55 (N.D.1974). Naturally, the factual question of what is "reasonable assurance" is for the jury to determine.

■ In addition, the component manufacturer must give an *adequate* warning. *Alm, supra,* at 592; *see also, e.g., Woodill v. Parke Davis & Co.,* 79 Ill.2d 26, 36 Ill.Dec. 304, 402 N.E.2d 194, 199 (Ill.1980). As with the reasonableness of assurance that an intermediary will convey a warning, the adequacy of the warning given the intermediary is for the jury to determine. *Bryant v. Technical Research Co.,* 654 F.2d 1337, 1345 (9th Cir.1981) (interpreting Idaho law); *Alm, supra,* at 592; *Oak Grove Investors v. Bell & Gossett Co.,* 99 Nev. 616, 668 P.2d 1075, 1080 (1983).

■ Regarding both of the above factual questions, the record clearly contains substantial competent evidence to support the verdict. Substantial competent evidence was introduced which indicated that ALCOA not only *knew* that Seven-Up U.S.A. and other intermediaries had failed to include warnings to consumers of the dangers of blow-offs, but also that ALCOA had *not suggested* that the intermediaries include such warnings. Based on this evidence, the jury readily could have found that ALCOA lacked reasonable assurance that the warning would reach the consumer. *Accord, Hopkins, supra; Seibel, supra.*[3]

---

**3.** The fact that ALCOA lacked control over the finished product does not as a matter of law absolve it of its duty to warn. *Hopkins, supra,* 630 F.2d at 619; *Alm, supra,* at 591–92; *Seibel, supra,* 221 N.W.2d at 55. ALCOA could have suggested and even insisted on a warning by the intermediaries. In addition, ALCOA could have communicated a warning through national media. The Slimans' expert Greene testified that in such circumstances warnings through advertisements were customary in the consumer product industry. R., p. 108. The Restatement observes:

> If, however, the third person is known to be careless or inconsiderate or if the purpose for which the chattel is to be used is to his advantage and knowledge of the true character of the chattel is likely to prevent its being used and so to deprive him of this advantage—as when goods so defective as to be unsalable are sold by a wholesaler to a retailer—the supplier of the chattel has reason to expect, or at least suspect, that the information will fail to reach those who are to use the chattel and whose safety depends upon their knowledge of its true character. *In such a case, the supplier may well be required to go further than to tell such a third person of the dangerous character of the article, or, if he fails to do so, to take the risk of being subjected to liability if the information is not brought home to those whom the supplier should expect to use the chattel.* In many cases the burden of doing so is slight, as when the chattel is to be

■ Substantial competent evidence also was introduced that ALCOA knew that consumers' use of tools on the caps could and had resulted in blow-offs, *but that ALCOA's warnings to intermediaries omitted this particular risk.* Based on this evidence, the jury could have found that ALCOA had failed to give adequate warnings. *Accord, Alm, supra,* at 594.

■ ALCOA alternatively asserts that the manner in which Carolyn Sliman attempted to open the soft drink—characterized by ALCOA as a "misuse" of the product—was so unforeseeable that ALCOA had no duty to warn the risks involved. As is well established, a supplier has no duty to warn where the use made of a product was not known or reasonably fore-

seeable to the manufacturer or seller. *Robinson, supra,* 94 Idaho at 826–27, 498 P.2d at 1299–1300; *see generally* 1A L. Frumer and M. Friedman, *Products Liability* § 8.03 (hereinafter *Products Liability* ). The factual question of foreseeability is for the jury to determine. 1A *Products Liability, supra,* § 8.03[1] ("This being an area in which judges find it difficult to agree, the issue should ordinarily be left to the common sense of the jury.") (*see* cases cited therein). In this case, substantial competent evidence was introduced that ALCOA not only foresaw but had actual knowledge of consumers' using tools to remove caps. The jury readily could have found that ALCOA could have foreseen Carolyn Sliman's actions.[4]

---

used in the presence or vicinity of the person supplying it, so that he could easily give a personal warning to those who are to use the chattel. *Even though the supplier has no practicable opportunity to give this information directly and in person to those who are to use the chattel or share in its use, it is not unreasonable to require him to make good any harm which is caused by his using so unreliable a method of giving the information which is obviously necessary to make the chattel safe for those who use it and those in the vicinity of its use.* Restatement (Second) of Torts § 388, comment n (emphasis added).

4. The dissent erroneously asserts that "[t]he record reflects that ALCOA had no knowledge of this type of incident...." From this the dissent concludes that ALCOA could not have foreseen the manner in which Sliman opened the bottle. The dissent overlooks the testimony of ALCOA's senior packaging engineer. He testified that not only did he foresee the use of tools to remove the caps, but also that "I've observed tools, pliers [the tool used by Sliman], rubber pads, towels, used for turning the closure...." Tr., p. 463. He further testified that such use of tools "could produce the expulsion of the closure." Tr., p. 464. And he testified that "we might have had claims which involved pliers or crescent wrenches, Channel Loks, Vise-Grips, it's surprising the number of various implements that we've seen, that people do sometimes try to use." Tr., pp. 464–65. He later admitted that the engineering department "had seen some" blow-offs caused by the use of tools. Tr., p. 465.

The dissent also selectively reads the testimony from the Sliman's expert, Mr. Greene. In fact, the dissent goes so far as to omit portions of Greene's testimony without the proper use of elipses. He testified that he personally had

worked on "20 or more cases ... [where] people were using tools to open the container, and that's another very common thing." Tr., p. 70. ALCOA was involved in at least four of these cases prior to 1979. Tr., p. 86. Greene noted that when the cap's threads are shallow, "many times a person has to go get a pliers to remove it...." Tr., p. 72.

The testimony under cross-examination which the dissent cites reads as follows:

Q. Do you know of any other situation, other than this, where someone was injured, or a cap was actually torn causing the cap to blow off?

A. *Well, I'm sorry, I confused your question. Many times a tool is used to open it, but where the tearing is exactly like this tearing, I don't know of another case.* Tr., pp. 116 (emphasis added).

The dissent overlooks Greene's all-important qualification that he knew of "many" accidents involving tools, though not accidents "exactly like this."

If the dissent finds some significance in slight variations among details of accidents involving tools, then the dissent is splitting hairs. Of course such accidents will vary in their "exact" detail. Greene testified that "many times people damage the cap [with tools] when they're trying to use that to open it, a very common, foreseeable situation that happens on many occasions." Tr., p. 75. It matters little that the "exact" damage varied from one accident to the next. The key point is that ALCOA could have foreseen, and in fact even knew of and was involved in accidents involving tools. The instructions and warnings necessitated by such accidents are the same for all such accidents.

Unquestionably, substantial competent evidence showed that ALCOA could have foreseen and even knew of accidents involving tools.

In sum, there being substantial competent evidence to support the jury's findings and the verdict, they will not be set aside. *Spanbauer, supra,* 107 Idaho at 44, 685 P.2d at 273.

## III.

ALCOA next asserts that the district court erred in admitting into evidence a list of 229 claims involving "blow-off" accidents of which ALCOA was familiar prior to the instant accident. Chief Justice Donaldson recently set out the appropriate standard of review as follows:

> *Decisions regarding the inclusion or exclusion of evidence are within the sound discretion of the trial court and will not be upset on appeal absent a showing that the trial court abused its discretion. See, e.g., Rosenberg v. Toetly,* 94 Idaho 413, 489 P.2d 446 (1971). Evidence of other accidents may be admissible to prove the existence of a particular physical condition or defect, the risk created by a defendant's conduct, that the defect cause the alleged injury, or that a defendant had notice of the danger. McCormick on Evidence, § 200 (3rd Ed. 1984). *Evidence of other accidents may be excluded if the trial court decides* that the evidence would unfairly prejudice the opposing party, *that the other accidents are not substantially similar to the subject case,* or that admission will raise collateral issues or confuse the jurors. *Id.*
>
> *Fish Breeders of Idaho, Inc. v. Rangen, Inc.,* 108 Idaho 379, 382, 700 P.2d 1, 4 (1985) (emphasis added).

The evidence clearly was relevant to whether or not the "defendant had notice of the danger," *id.,* which in turn was material to whether ALCOA had sufficient knowledge of the risk to require a warning, *e.g., Gillham v. Admiral Corp.,* 523 F.2d 102, 109 (6th Cir.1975); *see generally,* 1A *Products Liability, supra,* § 12.01[2] ("[E]vidence of prior accidents involving the same product

under similar circumstances is admissible to show notice to the defendant of the danger."), and to whether punitive damages were warranted. *See Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 905, 665 P.2d 661, 669 (1983) ("An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.' *Hatfield v. Max Rouse & Sons Northwest, supra,* 100 Idaho [840] at 851, 606 P.2d [944] at 955. *See Linscott [v. Ranier Nat. Life Ins. Co.,* 100 Idaho 854, 606 P.2d 958], *supra. "*) ALCOA's principle contention is that the prior accidents were so different from the instant one that the district court abused its discretion in admitting the evidence of prior accidents.[5] We find no merit to this contention.

As indicated in *Fish Breeders, supra,* the prior accidents only need be "substantially similar" to the instant one, not identical in every detail. 108 Idaho at 382, 700 P.2d at 4; *see also Cogswell v. C.C. Anderson Stores Co.,* 68 Idaho 205, 215–16, 192 P.2d 383, 389 (1948); *see generally* 1A *Products Liability, supra,* § 12.01[2]. The listed prior accidents all involved the forcible ejection of 28 millimeter roll-on aluminum caps, as in the instant accident. Most of the accidents involved injuries to the eyes, as in the instant case. The precise causes of the blow-offs varied; however, in the context of the plaintiffs' allegations of failure to warn, this variation is of little consequence. Regardless of the *cause* of the blow-offs, the fact remains that they did occur in the prior accidents just as in the instant accident. The warnings and instructions necessitated by knowledge of this danger would be the same. In short, we cannot say that the district court abused its discretion in admitting the evidence of prior accidents. *Fish Breeders, supra,* 108 Idaho at 382, 700 P.2d at 4.

5. ALCOA claims it never denied knowledge of the danger, and thus the evidence of the prior accidents was irrelevant. However, ALCOA fails to identify in the record any affirmative measures to admit or publish.

## IV.

Finally, ALCOA argues that the district court erred in submitting the issue of punitive damages to the jury. This Court recently set out the appropriate standard of review as follows:

Punitive damages are "not favored in the law and therefore should be awarded only in the most unusual and compelling circumstances." *Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 904–05, 665 P.2d 661, 668–69 (1983). The policy behind such damages is deterrence rather than punishment. *Id.* at 905, 665 P.2d at 669. "An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was 'an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences.'" *Id.* (Citation omitted.) "The justification for punitive damages must be that the defendant acted with an extremely harmful state of mind, whether that state be termed 'malice, oppression, fraud, or gross negligence.'" *Id.*, quoting *Morrison v. Quality Produce, Inc.*, 92 Idaho 448, 450, 444 P.2d 409, 411 (1968).

The decision of whether to submit the question of punitive damages to the trier of fact rests within the discretion of the trial court. [Citations omitted.] *Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706, 722 (Sup. Ct.1986) (emphasis added).

In part, ALCOA bases its argument on the premise that the admission of the evidence indicating ALCOA's knowledge of prior accidents was error. However, as just explained, we find no error in admitting that evidence.

Neither do we find error in the admission of the following testimony of plaintiffs' expert witness George Greene:

Q. (By Mr. Nelson) ... Do you have an opinion as to whether the conduct of Alcoa and 7–Up U.S.A. was an extreme deviation from customary and usual action taken by manufacturers of consumer products?

A. (By Mr. Green) I do.

.... [Objections by counsel omitted.]

Q. What is your opinion in that regard?

....

A. It's my opinion that the failure to correct this problem, or to warn, at least warn the public about it, is an extreme deviation from the customary practice in the industry.

Tr., pp. 108–10.

ALCOA's objection is based on the archaic notion that experts may not offer opinions on matters of ultimate fact. This is not the law of Idaho. In Idaho, experts may testify to ultimate issues or facts so long as their testimony assists the trier of fact. *See Davis v. Nelson-Deppe, Inc.*, 91 Idaho 463, 469, 424 P.2d 733, 739 (1967); *see generally, Comments to the Idaho Rules of Evidence* (1985), comment to Rule 704, p. 3.[6] The determination of what will be of assistance to the trier of fact lies within the broad discretion of the trial court. *Brown v. Jerry's Welding and Construction Co.*, 104 Idaho 893, 897, 665 P.2d 657, 661 (1983). The record affords evidence that Mr. Greene was a qualified safety engineer and was familiar with customary practices in the consumer products industry.[7] His testimony as to ALCOA's "extreme deviation" from these customary practices was relevant to the issue of punitive damages. *Soria, supra,* 726 P.2d at 722. Mr. Greene's learned opinion arguably assisted the less knowledgeable triers of fact in

---

**6.** Rule 704 became effective along with the rest of the new Idaho Rules of Evidence on July 1, 1985, after the date of the instant trial. However, as the Evidence Committee noted, Rule 704 is consistent with prior Idaho law. *Id.*

**7.** Contrary to ALCOA's argument, the rules of evidence do not require an expert to testify only to the standard particular branch of industry in

which the defendant operates (here the bottling industry as a branch of the consumer products industry); nor do they require that the expert articulate a standard at all. Certainly the adverse party may argue that these factors make the witness's testimony of no assistance, and may explore through cross-examination the witness's basis for opinion, but the district court retains the discretion to permit the opinion testi-

determining whether ALCOA acted in extreme deviation from reasonable standards of conduct. Accordingly, the district court did not abuse its discretion in permitting this testimony.

■ With this evidence of ALCOA's "extreme deviation," of ALCOA's long-standing knowledge of the prior accidents, and of ALCOA's failure to insure that consumers were warned of the risk of which it was aware for so long, the record supports the jury's finding that ALCOA "show[ed] a reckless disregard for plaintiff's safety and an extreme deviation from standards of

mony based on its view of the "assistance" value of the testimony.

8. In addition, ALCOA's senior packaging engineer knew of a feasible and safer alternative design from 1973 on, but ALCOA failed to modify its design to alleviate the risk. While this evidence is not directly relevant to punitive damages flowing from ALCOA's failure to warn, it demonstrates ALCOA's attitude of remaining aloof from changes which if made in all likelihood would have obviated its duty to warn.

The dissent argues that the district court abused its discretion in submitting the issue of punitive damages to the jury. *See, Soria, supra.* The dissent claims that the award would have no deterrent effect, because ALCOA could not have implemented a safer design. (The dissent ignores testimony on design changes ALCOA *could have* implemented. Tr., p. 88.) The dissent forgets its own initial observation that this is not a defective design case, but a failure to warn case. Quite clearly, the award of punitive damages acts as a deterrent to inadequate (in fact, absent) warnings.

The dissent also ignores the punitive aspect to punitive damages to which its own authority, *Boise Dodge, Inc. v. Clark,* 92 Idaho 902, 908, 453 P.2d 551, 557 (1969), alludes.

The dissent's numbers game is disingenuous. As already demonstrated, the number of accidents in which tools were involved was greater than what the dissent is willing to admit. In any event, the total number of blow-offs is what matters, because that number should have led ALCOA to issue or insist on warnings and instructions, which would have protected consumers from *any* manner of blow-off. Further, the number of law suits filed against ALCOA is not the limit to the total number of blow-offs. Expert Greene testified that ALCOA could have foreseen probably "a couple thousand or more of these potential blow-offs for every time that you injure somebody, sir." Tr., p. 86. Such misses are part of the risk considered in safety engineering and risk analysis. Tr., p. 87. Finally, the great numbers of bottles marketed with

reasonable conduct." R., Vol. 5, p. 358 (special verdict).[8] The district court did not abuse its discretion in submitting the issue of punitive damages to the jury. *Soria, supra,* 726 P.2d at 722; *cf., Gillham, supra,* 523 F.2d at 108–09.

## V.

The decision of the district court is affirmed. Costs are awarded to respondents, without an award of attorney's fees.

DONALDSON, C.J., and WALTERS, J. (pro tem) concur.

these caps insured that even with a low rate of blow-offs, such accidents were inevitable without proper instructions and warnings.

The dissent also ignores the *magnitude* of the risk. The evidence showed that blow-offs could never be eliminated. *E.g.,* Tr., p. 76. Together with the fact that consumers purchase so many of these bottles, this insured that a certain number of consumers would be injured, many as seriously as was Sliman. Greene testified that proper instructions and warnings would virtually eliminate these injuries. Considering the seriousness of injuries like Ms. Sliman's, the failure to warn appears all the more egregious.

Fantastically, the dissent asserts that no foundation was laid for Greene's testimony. Greene testified on the basis of 15 years' background and experience in the consumer product industry and in the bottling industry. Tr., pp. 64, 107. He had extensively studied the risk of blow-offs from 1973 on. Tr., p. 59. He was familiar with what ALCOA knew and had done concerning blow-offs up to the time of the accident. Tr., pp. 66, 92. He had compared ALCOA's actions with the ordinary and customary standard of care in the consumer product industry. Tr., pp. 83–84. He testified that where so serious a risk cannot be eliminated through design improvement, "[t]he next step is a warning to the user." Tr., p. 91. He testified:

I've observed that if the condition is known to manufacturers which would cause injury to consumers, in far less numbers than we have in this case, the industry practice is to do something about it, that if you can, you correct it by design, if you cannot correct it by design, you must warn the consumer to protect him. Tr., p. 107.

In short, he established (1) his knowledge of industry practices and of ALCOA's practices, and (2) that he had compared ALCOA's practices with the industry practices. His conclusion that ALCOA's practices were an extreme deviation from the customary practice was grounded on the soundest of foundations.

All this evidence demonstrates that the district court acted within its discretion in submitting the issue of punitive damages to the jury.

McFADDEN, Justice, Pro Tem., dissenting.

It is my conclusion that the plaintiffs failed to state and prove a claim against Alcoa, and further that in any event the trial court erred in submitting to the jury the issue of punitive damages. At the outset it must be pointed out that ultimately the only claim against Alcoa was based on the theory that it had failed to give any warning to the consumer of the potential danger of a bottle cap injuring the consumer when attempting to remove the cap.[1] The issues on this appeal must be considered in light of the fact that Alcoa is only one link in the chain of manufacturing and distributing of a product, *i.e.*, a two-liter bottle of 7–Up. The liabilities of other members of this chain of manufacturing and distribution, that is the bottler, distributor, and retail store, are not before the Court in this appeal.

The majority recognizes that the issue of when a manufacturer of a component part has the duty to warn of risks associated with it is one of first impression before this Court. Relying upon the case of *Alm v. Aluminum Company of America*, 717 S.W.2d 588 (1986), to sustain the judgment in this action, the majority holds that the position of Alcoa in contending that the misuse of the product by Mrs. Sliman was not foreseeable, is untenable for such is a factual issue for jury resolution. With this position I disagree, for the reason that considering the multitude of caps manufactured by Alcoa, as compared to the number of incidents of injuries from these caps, it can be said as a matter of law that Alcoa could not foresee the manner in which Mrs. Sliman opened the bottle of 7–Up. The key inquiry is whether the intervening act of Mrs. Sliman is foreseeable. "Ordinarily, the question of foreseeability is a question of fact. ... However, when the undisputed facts can lead to only one reasonable conclusion, the court may rule upon the issue of foreseeability as a matter of law." *LaChance v. Ross Machine and Mill Sup-*

*ply, Inc.*, 102 Idaho 505 at 507, 633 P.2d 570 at 572 (1981).

Part I of the majority opinion upholds the decision of the district court that Alcoa had a duty to warn the ultimate consumer, Mrs. Sliman, even though Alcoa had no prior notice of the specific type of accident she suffered. The majority cites cases such as *Robinson v. Williamsen Idaho Equipment Co.*, 94 Idaho 819, 498 P.2d 1292 (1973). In this regard I believe the majority erred, because in *Robinson* the Court went on to state:

> If the danger is not obvious or actually known, the warning given must adequately communicate to the user the information in the supplier's possession which is necessary to avoid unsafe use of the product. While the warning need not be the best possible, it must be reasonable under the circumstances, for an inadequate warning is viewed as no warning at all. The reasonableness of the warning, like the reasonableness of conduct in any negligence context, is related to the risk and extent of the foreseeable harm. The protection afforded through the warning must be reasonably coextensive with the danger, in light of the user's experience with the product.

*Robinson v. Williamsen Idaho Equipment Co., supra*, at 827, 498 P.2d at 1300.

The trial record shows that Alcoa warned the bottlers licensed by Alcoa of the problem created by misapplied caps. No other incident involving the ripping of the threads of the cap with a tool, as occurred here, was shown by the record. The plaintiff's expert, Mr. Greene, even admitted that this was a unique accident:

> Q. At Line 8 you were asked, and I believe this was Mr. Racine, "Q. Have you ever testified in a case where they've attempted to tear off the cap, lid or pilfer-proof band, either one, with a tool?"

---

**1.** The only theory relied on by the plaintiffs for recovery against Alcoa was a failure to warn of a known danger. The record discloses that the plaintiffs presented no evidence to support recovery on the theory of either a defective product or defective design.

What was your answer there?

A. It was, "No, sir."

Q. Do you know of any other situation, other than this, where someone was injured, or a cap was actually torn causing the cap to blow off?.

A. Well, I'm sorry, I confused your question. Many times a tool is used to open it, but where the tearing is exactly like this tearing, I don't know of another case.

But that's true, generally the tool is used to open the cap, but not necessarily tearing the cap like that.

• In fact, the entire record discloses no other prior incidents where someone ripped the threads with a tool. The record reflects that Alcoa had no knowledge of this type of incident, and took the only reasonable step under the circumstances, that of warning its licensed bottlers of the hazards of misapplied caps.

By agreement between Alcoa and the bottlers licensed to use Alcoa's process, once the caps left Alcoa's possession, Alcoa had no control over the labeling, bottling, or distribution of the ultimate product. Alcoa stands in the position of a supplier of a component part. The record discloses that Alcoa supplied the blank caps and that the bottlers filled the bottles and affixed the blank caps by a process developed by Alcoa.[2] It is my conclusion that the majority's reliance on § 388 of the Restatement (Second) of Torts is misplaced. The Restatement (Second) leaves its position on the issue of the responsibility of the supplier of a component part completely open for resolution when:

[T]he seller sells a product which is not intended to reach the consumer in about the same condition as it left, but is expected to be "processed or otherwise substantially changed" before it reaches him.

*Walker v. Stauffer Chemical Corp.,* 19 Cal.App.3d [669] 671 at 674, 96 Cal. Rptr. 803 at 806 (Cal.D.Ct.App.1971) (quoting Witkin, Summary of California Law, 1969 Supp. 766 at 768). *See* Restatement (Second) of Torts § 402A caveat (2) and comment p.

Several states have held that no duty to warn the ultimate consumer attaches in such a situation. In *Blackburn v. Johnson Chemical Co., Inc.,* 490 N.Y.S.2d 452, 128 Misc.2d 623 (N.Y.Sup.Ct.1985), the court held that a manufacturer of a can sold to a company who manufactured an aerosol insecticide which later exploded, had no duty to warn because the company had no control over the labeling or the marketing of the product.

In *Shell Oil Co. v. Harrison,* 425 So.2d 67 (Fla.D.Ct.App.1982), the court held Shell had no duty to warn the ultimate consumer. Here, Shell supplied a lawn chemical, Nemagon, to Kerr-McGee who then diluted the substance and marketed it. Shell knew of the dangers and informed Kerr-McGee. Shell had fulfilled its duty because it no longer had any control over the product even though the product was an inherently dangerous substance.

In *Hill v. Wilmington Chemical Corp.,* 156 N.W.2d 898 (Minn.1968), Shell supplied a solvent to Wilmington, who mixed it with a product of DuPont to make a waterproofing paint. Shell warned Wilmington of the flammability of its product and the enactment of a federal act concerning the labeling of hazardous substances. Since Shell had no control over the labeling, packaging, or manufacture of the end product, the court held that Shell had no duty to warn the ultimate consumer.

In *Walker v. Stauffer Chemical Corporation,* 19 Cal.App.3d 669, 96 Cal.Rptr. 803 (1971), Stauffer Chemical was the manufacturer of sulphuric acid which was supplied to a manufacturer of a drain cleaner. The

**2.** With Alcoa's process, no threads are present on the cap at all (called a "blank") when the cap is inserted on the bottle after filling. A machine grabs the bottle by a ridge just below the threads on the bottle (called the "finish") and inserts the bottle into a piece called the headset. In the headset, rollers press on the blank and mash the malleable aluminum into the threads of the bottle finish, forming the thread in the cap that holds the cap on the bottle. Tr., p. 78.

plaintiff was injured when a can of drain cleaner exploded. The court refused to hold Stauffer liable because the company had no control over the packaging, labeling, or marketing of the drain cleaner.

In *Lee v. Butcher Boy*, 169 Cal.App.3d 375, 215 Cal.Rptr. 195 (1985), the plaintiff was injured by a meat grinder manufactured by Butcher Boy. The plaintiff tried to recover from the manufacturer of the electric motor. The court held that the motor was not defective and the manufacturer had no control over the manufacture of the finished grinder. Therefore, the manufacturer had no duty to warn.

All the cases cited above involve a product that was not defective. Further, the product was incorporated into a finished consumer item over which the defendant had no control in the labeling, manufacturing, and marketing. In the instant case no claim was ever made that the cap was defective in design or manufacture. Alcoa had no control over the labeling, bottling, or marketing of the finished product. Somehow, the majority upholds a duty to warn of the danger of torn threads when such a thing had never happened before, and Alcoa had warned the bottlers of the known danger of misapplication. The majority relies heavily on the recent Texas case of *Alm v. Aluminum Company of America*, 717 S.W.2d 588 (Tex.1986). I find the reasoning in the dissenting opinion of Justice Gonzalez to be more persuasive in this case:

> Alcoa's position, as a remote manufacturer, is relevant to the duty it owed customers because it affects the extent of Alcoa's duty to warn and its ability to effectively distribute a warning. Significantly, Alcoa is the manufacturer of one product, the capping machine, while J.F.W. is the assembler of the injury producing product, the 7–Up bottle. Alcoa sold the capping machine to J.F.W. whose employees operated and maintained the machine. Alm was injured by a misapplied bottle cap which resulted from allowing the capping machine to get out of adjustment. J.F.W., an intermediate assembler, controlled the entire bottling process.

> The mere presence of J.F.W. as an intermediary does not necessarily relieve Alcoa, the original manufacturer, of its duty to warn. When the original manufacturer gives a warning to an intermediate manufacturer or assembler, however, it can be relieved of its liability for the intermediary's failure to disseminate the warning. (citations omitted.) In other words, when a manufacturer notifies an intermediary and the intermediary proceeds to sell the product anyway, the manufacturer is insulated from liability.

> *Alm, supra* (Gonzalez, J. dissenting at p. 595).

After reviewing the numerous authorities on this subject, and recognizing the fact that there is a division of authority on the question of the liability of a component part for failure to give warning to the ultimate consumer, I am of the opinion that the line of authority I have cited including the dissent of Justice Gonzales in *Alm*, is the better rule and should be followed and adopted by this state. I would conclude, therefore, that the manufacturer of a component part, such as Alcoa, which has no control of the labeling, bottling, or distribution of the ultimate product, has no duty as a matter of law to warn the ultimate consumer.

In my opinion the issue of punitive damages should never have been submitted to the jury. In assessing punitive damages, relevant factors include:

> [T]he prospective deterrent effect of such an award upon persons situated similarly to the defendant, the motives actuating the defendant's conduct, the degree of calculation involved in the defendant's conduct and the extent of the defendant's disregard of the rights of others. *Boise Dodge, Inc. v. Clark*, 92 Idaho 902, 908, 453 P.2d 551, 557 (1969).

The award in this case can serve no deterrent effect. In footnote 6 the majority alludes to the Zapata patent as a safer design to alleviate the risks of blow-off. Alcoa's engineer, Bing Welch, testified that

Zapata had patented a safer design. He went on to say that Alcoa had no license to use this design and that the bottlers claimed that at the time (prior to October 6, 1979), it was not feasible to produce the new bottle finish essential for use of this design. He further testified that no design would have held the cap on in this case, as opposed to cases involving misapplication, and that no deviation from standards of the industry, much less an "extreme deviation" occurred simply because there are no standards. Alcoa in no way remained aloof from change which if made in all likelihood would have obviated its duty to warn.

Punitive damages are recoverable in a tort action only when it is shown that the defendant was in an extremely harmful state of mind, whether termed malice, oppression, fraud, gross negligence, or wantonness. *Cheney v. Palos Verdes Inn Corp.*, 104 Idaho 897, 665 P.2d 661 (1983); *Yacht Club Sales and Service, Inc. v. First Nat. Bank of North Idaho*, 101 Idaho 852, 623 P.2d 464 (1980); *Linscott v. Rainier Nat. Life Ins. Co.*, 100 Idaho 854, 606 P.2d 958 (1980). That degree of calculation involved in approaching malice, oppression, fraud, or gross negligence simply is not present to justify an award of punitive damages here. In the time period concerned, from 1967 to 1979, 229 claims were known. In any case, whether evidence of the 229 claims against Alcoa is admissible or not, the case put on by the plaintiff shows that during that period roughly 83 billion closures had been marketed. Testimony showed that accidents occurred at the rate of 3–8 accidents per billion closures. An accident such as the one at issue here had happened but once, or one per 83 billion closures. As stated before, Alcoa had taken reasonable and adequate measures to warn the bottlers of the danger of misapplication. To claim Alcoa was wanton and reckless and acted with gross negligence for an occurrence that happened once in the use of 83 billion caps borders on the absurd.

Finally, the plaintiff's expert testimony that Alcoa committed an extreme deviation from consumer industry standards is without merit. No foundation for this statement was ever laid. No industry standards were ever introduced in evidence. Punitive damages are not favored in the law. Certainly this case is not one for such damages. The trial court erred in submitted this issue to the jury.

SHEPARD, J. concurs.