923 P.2d 988

**Frances S. HAWKS, Plaintiff–Respondent–Cross Appellant,**

v.

**EPI PRODUCTS USA, INC., Fred Meyer, Inc., Mepro Electric, and Unknown Corporations A through Z, Defendants–Appellants–Cross Respondents.**

No. 21697.

Supreme Court of Idaho, Boise, March 1996 Term.

Sept. 19, 1996.

Rehearing Denied Sept. 19, 1996.

Brady, Lerma Chtd., Boise, for appellants. Michael G. Brady argued.

Evans & Keane, L.L.P., Boise, for respondent. Jed W. Manwaring argued.

## SUBSTITUTE OPINION

### THE COURT'S PRIOR OPINION DATED JULY 31, 1996 IS HEREBY WITHDRAWN

SCHROEDER, Justice.

This is an appeal from a judgment entered following a jury trial in a products liability action. The defendants/appellants, EPI Products U.S.A., Inc. (EPI), Fred Meyer, Inc. (Fred Meyer), and Mepro Electric, Inc. (Mepro),[1] appeal the district court's determination that EPI is a manufacturer pursuant to section 6–1402(2) of the Idaho Code.[2] The appellants also challenge the trial court's exclusion of an expert witness's testimony, as well as the court's admission of testimony from a witness regarding a similar prior products liability claim. In a cross-appeal the plaintiff/respondent, Frances S. Hawks (Hawks): (1) challenges the trial court's determination that Fred Meyer is immune from direct liability pursuant to section 6–1407(1) of the Idaho Code; (2) challenges the trial

---

1. Collectively, the Defendants.

2. **"Compiler's notes.** Chapters 93 and 225 of S.L.1980 each purported to enact a new chapter 13 in title 6. Accordingly, chapter 93 has been codified as title 6, chapter 13 (§§ 6–1301, 6–1302) while chapter 225 has been codified as title 6, chapter 14 and bracketed section designations inserted by the compiler to indicate the necessary change in numbering from the law as enacted." I.C. §§ [6–1401] 6–1301—[6–1410] 6–1310 (1990).

court's denial of her motion to amend her complaint to add a claim under the Idaho Consumer Protection Act (ICPA) and a claim for punitive damages; and (3) requests attorney fees on appeal pursuant to Rule 41 of the Idaho Appellate Rules (I.A.R.). However, Hawks has proposed waiving the claims on the cross-appeal, except for the claim involving Fred Meyer's immunity from liability, if this Court upholds the jury verdict with or without a five (5) percent reduction in the verdict resulting from a post-trial ruling of the district court.

## I.

## BACKGROUND

Hawks was injured by using an "Epilady" depilatory device which is designed to remove body hair from the arms and legs by pulling it out by the roots. The Epilady device was designed and developed by Mepro, which is based in Israel. In May of 1986, Mepro contracted with Frank Riedy (Riedy), president of McClees Associates, to develop a marketing plan for the sale of the Epilady in the United States. Riedy developed a marketing plan, and EPI Products obtained the rights to the product in the United States soon thereafter. The Memorandum of Understanding between EPI and Mepro stipulated that the manufacturing of the Epilady was to be "carried out by a company, jointly and equally owned by the parties." At or about the time Mepro and EPI entered into this agreement, McClees and Associates began working jointly for Mepro and EPI.

In anticipation of marketing the product in the United States, Riedy arranged for TKL Research to test the "safety and efficacy" of the Epilady. The testing was done for the joint benefit of EPI and Mepro, and was paid for by Mepro. The testing was done in three phases and was completed by August of 1987, at which time marketing of the product in the United States began.

The TKL study was based on a test group of 150 women, specifically excluding women with a past or present history of allergic reactions to depilatories, eczema, dermatitis, or psoriasis, as well as those who experienced any skin reactions within two weeks of study entry. The test concluded that, "[n]o unexpected or clinically significant dermatologic conditions were observed. Undesirable sensations which were primarily reported after the first epilation diminished with each successive use." TKL recommended that Epilady customers be forewarned about the potential for ingrown hairs and instructed as to the proper corrective measures in product demonstrations. TKL also advised EPI that package instructions alone would be inadequate and would likely result in widespread customer dissatisfaction. Based on a "relatively high incidence of ingrown hairs and a low incidence of folliculitis,"[3] in study subjects who were thoroughly briefed on the proper use of the product and treatment of potential problems, TKL strongly endorsed EPI's plan to provide in-store demonstrations on the proper use of the Epilady and the establishment of a toll-free telephone number "to counsel subjects who have questions or are experiencing problems" as part of its marketing plan.

Based on the TKL study results, which identified risks of pain, ingrown hairs, and folliculitis, a product instruction insert for the Epilady was developed by Riedy, Mepro, EPI, and D.B. Meedham, an advertising company. The product instruction insert was printed and published by EPI. While the insert did address the potential for ingrown hairs and how to reduce their occurrence, it did not specifically mention the possibility of folliculitis. The insert spoke in terms of red or irritated skin and recommended consulting a dermatologist if the condition persisted for 72 hours or more. The insert warned people with extremely sensitive skin, varicose veins, hemophilia, diabetes, or any skin condition such as psoriasis, eczema, or leg acne to consult a dermatologist or physician before using the product.

The Epilady was initially marketed through department store cosmetic counters in the New York and Los Angeles metropolitan areas. The in-store product demonstrations recommended by TKL were conducted at these stores. Mass marketing of the Epilady began in March of 1988. Although in-

**3.** Folliculitis is the formation of tiny pimples at the point where the hair is removed.

store demonstrations were not part of the mass-marketing effort, a toll-free customer service number was available to respond to customer inquiries or complaints. The customer service center received between 300 to 600 letters, and approximately 30,000 telephone calls per month regarding the Epilady product. Between three to six percent of these telephone calls were for medical problems.

Fred Meyer agreed to begin selling the Epilady in mid–1988. A buyer for Fred Meyer inspected an Epilady and tested it on the back of his hand. The buyer testified that he did not recall seeing any warnings or cautions with the product package or insert. Although it was the custom of Fred Meyer to consider the safety of the products it sold, Fred Meyer did not request verification of the product tests. Fred Meyer and the manufacturer's representative did agree that some product orientation was necessary at the "point of sale" to reduce the potential for customer dissatisfaction due to discomfort associated with the product's initial use.

On or about March 1, 1989, Hawks went to a Fred Meyer store in Boise. A salesperson demonstrated the Epilady on her arm and reviewed a package insert that accompanied the product with Hawks. Hawks testified at trial that she did not see any warnings of possible infection from use of the product and would not have purchased the product had she seen such warnings as she had chronic problems with infections. Hawks also testified, however, that she did not read the product insert word-for-word. She further testified that the type of infections she had experienced were internal not dermatological.

After purchasing the product, Hawks used it on her arms and legs three to five times over the course of four weeks. Although she experienced some redness and discomfort, the condition dissipated within 24 hours of each use. On March 30, 1989, Hawks noticed that her right arm had become red and inflamed above the elbow. She went to the emergency room at St. Luke's Hospital in Boise, where she was diagnosed with an infection (cellulitis) [4] and prescribed antibiotics.

Hawks remained at St. Luke's for one and one-half to two days. A few days after returning home the condition worsened. Hawks was in and out of the hospital four times between March 30 and May 5, 1989, as the cellulitis spread. Hawks incurred $16,-207.06 in medical expenses as a result of her condition.

## II.

### PROCEDURAL HISTORY

Hawks filed a complaint against Mepro, EPI, and Fred Meyer on April 9, 1990, alleging breach of express and implied warranties, negligence in the design, manufacture, marketing, and/or warnings associated with the Epilady, and strict liability. EPI denied being a manufacturer or designer of the Epilady. EPI subsequently filed bankruptcy under Chapter 11 on August 23, 1990. Considerable delay occurred as a consequence of the bankruptcy proceedings. A bankruptcy stay was ultimately lifted in July of 1993.

EPI is insured for product liability claims by United Capitol Insurance Company of Atlanta, Georgia (United Capitol). Fred Meyer and Mepro are additional insureds under the terms of that policy.

In February of 1994, Hawks moved to amend her complaint to allege a violation of the Idaho Consumer Protection Act (ICPA) and add a claim for punitive damages. The motion was denied.

Following trial the jury returned a special verdict which found that: (1) the Epilady was a defective, unreasonably dangerous product; (2) the Defendants failed to provide adequate warnings of the product's dangers; (3) the Defendants were negligent; and (4) the Defendants breached express and implied warranties in the sale of the Epilady to Hawks. The jury also found that Fred Meyer had a reasonable opportunity to inspect the product, but that it did not know or have reason to know of the defect in the product. The jury apportioned 65 percent of the liability for Hawks' injuries to Mepro, 30 percent to EPI, and five (5) percent to Fred Meyer.

---

4. Cellulitis is an inflammation of cellular tissue.

The jury awarded Hawks a total of $167,207.00 in damages.

The district court entered its judgment in accordance with the jury's verdict, finding that Mepro was liable to Hawks in the amount of $108,684.55; EPI was liable in the amount of $50,162.10; and Fred Meyer's five (5) percent share of the damage award was $8,360.35. The court determined, however, that EPI was insolvent. The court further concluded that EPI and Mepro were jointly involved in the manufacture of the Epilady product distributed in the United States, based on the fact that EPI manufactured and designed the product packaging and insert. The court concluded that EPI was a manufacturer pursuant to section 6–1402(2) of the Idaho Code.[5] The court then determined that, pursuant to section 6–1407(4)(b) of the Idaho Code,[6] Fred Meyer was subject to EPI's apportioned share of the Defendants' liability. The court also concluded, however, that Fred Meyer had established a complete defense to its five (5) percent share of the apportioned liability, pursuant to section 6–1407(1) of the Idaho Code.[7] The court concluded that, although the jury found that Fred Meyer had an opportunity to inspect the product, the jury also found that Fred Meyer did not know or have reason to know of the existence of the defective condition in issue. The effect of this determination was to reduce the total award of damages by $8,360.35.

Defendants sought a remittitur and/or new trial on the ground that the jury's award was excessive; that there was insufficient evidence for the trial court to determine that EPI was a manufacturer under section 6–1402(2); and, that the trial court erred regarding several evidentiary rulings. The motions were denied.

### III.

### EPI HELD ITSELF OUT AS A MANUFACTURER.

■ The Defendants argue that the district court erred in concluding that Fred Meyer is vicariously liable for EPI's 30 percent share of the Defendants' overall liability pursuant to section 6–1407(4)(b) of the Idaho Code. They assert that EPI does not meet the definition of a "manufacturer" under section 6–1402(2) of the Idaho Code, because EPI merely acted as a distributor of the Epilady product.

The district court found that EPI and Mepro "were jointly involved in the manufacture and distribution of the Epilady product in the United States." The court noted that, while Mepro apparently manufactured the actual product, the defective packaging and inserts were manufactured by EPI. We note additionally that the record reveals that prior to the Epilady's distribution in the United States EPI and Mepro entered into an agreement to jointly manufacture the product through a "company, jointly and equally owned by the parties." Furthermore, although Mepro was identified as the manufac-

---

5. **[6–1402] 6–1302. Definitions.—**

. . . .

(2) "Manufacturer" includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer. It includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer. A product seller acting primarily as a wholesaler, distributor, or retailer of a product may be a "manufacturer" but only to the extent that it designs, produces, makes, fabricates, constructs, or remanufactures the product before its sale.

. . . .

I.C. § 6–1402 (1990).

6. **Section 6–1407(4) states in relevant part:** "A product seller, other than a manufacturer, is also subject to the liability of manufacturer if: . . . (b) The manufacturer has been judicially declared insolvent in that the manufacturer is unable to pay its debts as they become due in the ordinary course of business." I.C. § 6–1407(4) (1990).

7. **[6–1407] 6–1307. Individual rights and responsibilities of product sellers other than manufacturers.—**(1) In the absence of express warranties to the contrary, product sellers other than manufacturers shall not be subject to liability in circumstances where they do not have a reasonable opportunity to inspect the product in a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition which is in issue; or where the product seller acquires the product in a sealed package or container. . . .

I.C. § 6–1407 (1990).

turer in small print on the Epilady product itself, EPI's name and logo were prominently displayed throughout the product's packaging, and the toll-free customer service number was provided by EPI.

Based on the parties' express agreement and the degree of EPI's involvement in the actual production of the product for distribution in this country, there was substantial, competent evidence in the record to support the trial court's finding that EPI held itself out as a manufacturer. The trial court did not err in imputing EPI's liability to Fred Meyer pursuant to section 6–1407(4).

## IV.

### THE DISTRICT COURT'S EVIDENTIARY RULINGS WERE NOT AN ABUSE OF ITS DISCRETION.

#### A. The Opinion Testimony of Dr. Sack was Properly Excluded.

The admissibility of expert opinion testimony is discretionary with the trial court, and its rulings will not be disturbed on appeal absent an abuse of that discretion. *Lawton v. City of Pocatello*, 126 Idaho 454, 463, 886 P.2d 330, 339 (1994).

The Defendants assert that the district court erred in excluding the testimony of their medical expert, Dr. Sack. They maintain that any deficiency in the foundation presented for Dr. Sack's testimony was the result of the district court's refusal to allow Dr. Sack to examine Hawks. Additionally, they argue that the court erroneously analyzed Dr. Sack's testimony based upon a "reasonable degree of medical certainty" standard rather than a "reasonable degree of medical probability" standard.

Contrary to the Defendants' assertion, the district court did not completely rule out the possibility of an examination by Dr. Sack. The court approved one medical examination of Hawks for her dermatological condition, but stated that it would not approve any other examinations unless the Defendants established that such other examinations were medically necessary. The Defendants did not pursue the matter. Furthermore, the trial court did not exclude Dr. Sack's testimo-

ny based on a "medical certainty" standard. The court stated that Dr. Sack's testimony to the effect that it was merely "possible" that Hawks' condition was a factitious disease was problematic.

The district court excluded Dr. Sack's testimony for lack of foundation, noting that Dr. Sack was not a psychiatrist, did not personally examine Hawks, nor consult with a psychiatrist who had. The court concluded that Dr. Sack's opinion lacked a sufficient factual basis and bordered on pure speculation. Moreover, the court stated that based on Dr. Sack's testimony it was apparent that Hawks did not fit the typical diagnosis of one suffering from factitious disease disorder in that each of the numerous ailments from which she had previously suffered were independently diagnosed and responded to medical treatment.

The district court did not abuse its discretion in excluding Dr. Sack's testimony.

#### B. The District Court Properly Admitted Evidence of a Prior Claim Against the Defendants.

The Defendants argue that the district court abused its discretion in admitting the testimony of Elaine LaVelle regarding a complaint she had made to EPI as a result of a severe skin infection she developed on her legs following use of the Epilady product. LaVelle's complaint was made prior to Hawks' purchase of the product. The Defendants argue that notice was not an issue in the case, and, consequently, LaVelle's testimony was more prejudicial than probative and should have been excluded. The record reveals, however, that notice was an issue in the case, and LaVelle's testimony was relevant to the issue of notice. At a hearing on pre-trial motions, the trial court specifically asked the Defendants whether they were willing to stipulate that notice of a dangerous condition was not an issue in the case. The Defendants declined.

Evidence of other accidents may be admissible to prove that a defendant had notice of the alleged danger. *Sliman v. Aluminum Co. of Am.*, 112 Idaho 277, 731 P.2d

1267 (1986), *cert. denied,* 486 U.S. 1031, 108 S.Ct. 2013, 100 L.Ed.2d 601 (1988). Evidence of other accidents may be excluded if the trial court decides that: (1) the evidence would unfairly prejudice the opposing party; (2) the other accidents are not substantially similar to the subject case; or (3) the evidence would raise collateral issues or confuse the jurors. 112 Idaho at 284, 731 P.2d at 1274.

The record on appeal does not include the district court's order in response to the Defendants' motions *in limine* seeking to exclude all evidence of prior complaints received by the Defendants which involved similar complications arising from use of the Epilady. Nevertheless, in the court's decision on post-trial motions, the court concluded that there was no error in the admission of LaVelle's testimony regarding her complaint to EPI prior to Hawks' purchase of the product. The district court noted the following:

> [I]t is the fact of those prior complaints which leads to a duty of a manufacturer to warn. Epi was responsible for the manufacturing of the packaging and insert and it was responsible for improving the warnings when it became aware, just as its early test had suggested, that the risk of infection was not uncommon. Admissibility of prior similar occurrences is common in products liability cases where it is offered on the issue of duty to warn. *Sliman v. Aluminum Co.,* 112 Idaho 277, 731 P.2d 1267 (1986), *Fish Breeders of Idaho, Inc. v. Rangen Inc.,* 108 Idaho 379, 700 P.2d 1 (1985).

The district court did not abuse its discretion in admitting LaVelle's testimony regarding her complaint to EPI in which she reported a severe skin infection following use of the Epilady.

## V.

## THE TRIAL COURT DID NOT ERR IN CONCLUDING THAT FRED MEYER IS IMMUNE FROM DIRECT LIABILITY PURSUANT TO SECTION 6–1407(1) OF THE IDAHO CODE.

■ Hawks argues on cross-appeal that the district court erred in concluding that Fred Meyer was immune from direct liability pursuant to section 6–1407(1) of the Idaho Code. The court based this conclusion on the jury's finding, with which it concurred, that Fred Meyer did not know, or have reason to know of the Epilady's defective warning. Hawks argues that Fred Meyer does not qualify for immunity under section 6–1407(1) of the Idaho Code because that section only applies in the absence of express warranties, and the jury found that Fred Meyer breached expressed warranties.

This Court reviews questions of law *de novo. In re Estate of Kirk,* 127 Idaho 817, 823, 907 P.2d 794, 800 (1995).

■ Hawks misconstrues the proper application of section 6–1407(1). In *Hoopes v. Deere & Co.,* 117 Idaho 386, 390, 788 P.2d 201, 205 (1990), we held that a retailer may be liable under section 6–1407(1) of the Idaho Code if one of several events occurred: (1) the retailer made express warranties concerning the product that were inconsistent with those made by the manufacturer; (2) the retailer had a reasonable opportunity to inspect the product and should have discovered the alleged defect; (3) the retailer had reason to know of the alleged defect; or (4) the retailer altered, modified, or installed the product's defective component. *Id.* Here, there was no allegation nor finding that Fred Meyer made an express warranty regarding use of the Epilady that was inconsistent with the express warranties made by EPI and Mepro. Likewise, there was no allegation or finding that Fred Meyer altered, modified, or otherwise changed the product's packaging or the product information contained therein. Rather, as the trial court correctly noted, the jury found that, while Fred Meyer had a reasonable opportunity to inspect the Epilady product, it did not know or have reason to know of the product's defective warning. Thus, as the trial court properly concluded, Fred Meyer is immune from direct liability for Hawks' injuries pursuant to section 6–1407 of the Idaho Code.

## VI.

## CONCLUSION

The judgment of the district court is affirmed. As a consequence, the Court does

not address the remaining issues raised on cross-appeal. Costs on appeal are awarded to Hawks pursuant to I.A.R. 40. Because this Court is not left with the abiding belief that this appeal was brought frivolously, unreasonably, and without foundation, no attorney fees are awarded. I.A.R. 41; I.C. § 12–121; *Kelly v. Silverwood Estates,* 127 Idaho 624, 630–31, 903 P.2d 1321, 1327–28 (1995).

McDEVITT, C.J., and JOHNSON, TROUT and SILAK, JJ., concur.